# WABASH, ST. LOUIS & PACIFIC RAILWAY COMPANY *v.* HAM & Others.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

Submitted January 8, 1885.—Decided May 4, 1885.

Four railroad corporations whose roads formed a connecting line in Ohio, Indiana and Illinois, were consolidated, according to the statutes of those States, under an agreement in which the capital on the basis of which each entered into the consolidation was described as composed of the amount of its stock and of its mortgage bonds and other bonds, and it was agreed that all those bonds should, "as to the principal and interest thereof, as the same shall respectively fall due, be protected by the consolidated company, according to the true effect and meaning of the bonds." Two years afterwards, the consolidated company, to secure its own bonds payable at a later date than the old ones, executed a mortgage of all its property to trustees, which recited that it had been deemed for the interest of the corporation as well as for the interest of all the various classes of existing bonds (which were specifically described) that the whole of them should be consolidated into one mortgage debt upon equitable principles; and provided that a sufficient amount of the new bonds should be retained "to retire, in such manner and upon such terms as the directors may from time to time prescribe," an equal amount of the old bonds. Six years later, the consolidated

company made another mortgage to secure other bonds, for non-payment of which it was afterwards foreclosed by sale of the whole property. *Held,* That the property was not subject to any lien in favor of bonds of one of the old companies, issued after the passage of the statutes authorizing the consolidation, unsecured by any mortgage or lien before the consolidation, and the holders of which had not exchanged or offered to exchange them for bonds of the consolidated company before the proceedings for foreclosure.

This was an appeal from a decree in equity, declaring certain bonds issued by the Toledo and Wabash Railway Company to be a lien upon property formerly owned by that company, and since transferred by it to the Toledo, Wabash and Western Railway Company, a corporation created by its consolidation with three other railroad corporations. 11 Bissell, 510. The material facts appearing by the record were as follows:

The Toledo and Wabash Railway Company, a corporation organized under the laws of the States of Ohio and Indiana, owning a railroad extending from Toledo in Ohio to Wabash in Indiana; its property in Ohio being subject to a first mortgage for $900,000, and a second mortgage for $1,000,000, and its property in Indiana subject to a first mortgage for $2,500,000, and a second mortgage for $1,500,000; on November 2, 1862, executed and issued for value bonds to the amount of $600,000, styled "Equipment Bonds," payable in New York on May 1, 1883, with coupons attached for semi-annual interest at the yearly rate of seven per cent.; and convertible at the option of the holder, at any time within five years, into common stock of the company at par. The company paid interest on those bonds to May 1, 1865.

On May 29, 1865, no lien of any kind then existing in favor of the equipment bonds, the Toledo and Wabash Railway Company and three railroad corporations incorporated by the States of Indiana and Illinois, whose roads formed a continuous line from Toledo to the Mississippi River, entered into an agreement to consolidate the railroads, property and capital stock, and to become one corporation under the name of the Toledo, Wabash and Western Railway Company, with a capital stock of $15,000,000, "upon the basis and conditions here-

inafter to be specified," the material parts of which were as follows:

"The Toledo and Wabash Railway Company enters into said consolidation on the following basis, viz.: Its capital is $10,000,000, composed as follows: 1st mortgage bonds, $3,400,000; 2d mortgage bonds, $2,500,000; convertible equipment bonds, $600,000; convertible preferred stock, $1,000,000; common stock, $2,500,000."

The basis on which each of the three other corporations "enters into said consolidation" was then set forth in like manner, by which the capital of the three together appeared to be $8,486,000, composed of mortgage bonds, $5,800,000; and stock $2,686,000; and one of those corporations assigned to the consolidated company certain mortgage bonds, and agreed to pay to it in cash the sum of $780,300, required to place its road in equal condition with the Toledo and Wabash Railway.

"It is further agreed that the bonds and other debts hereinabove specified, in the manner and to the extent specified, and not otherwise provided for in this agreement, shall, as to the principal and interest thereof, as the same shall respectively fall due, be protected by the said consolidated company, according to the true meaning and effect of the instruments or bonds by which such indebtedness of the several consolidating companies may be evidenced.

"The directors shall have power to issue any other and further bonds of said corporation to such an amount that the indebtedness of the consolidated company at any time shall not exceed the amount of the capital stock authorized by this agreement, and they may secure the bonds so issued by mortgage or other lien on the property of the consolidated company, or any specified part thereof."

The agreement of consolidation was ratified by the directors and stockholders of all the companies, and the stockholders of the old companies became stockholders in the new one; and this company came into possession of all the railroads and property of the four old companies, and received and distributed the earnings.

On February 1, 1867, the consolidated company executed to trustees a mortgage of all its railroads, property and franchises, to secure bonds to be issued by it, to the amount of $15,000,-000, payable in forty years, with interest at the yearly rate of seven per cent., and convertible at the option of the holders, at any time within ten years, into common stock of the company at par. The mortgage recited the consolidation, and also contained the following recitals:

"Whereas at the time of such consolidation the property of said various companies was subject to certain bonded debts, and the mortgages created by said several companies, or by other railroad corporations which, at the time of the creation of said debts and mortgages, were the owners of the property so consolidated; and whereas all the bonded debt of said company, party of the first part, including that secured by said mortgages, as well as that not secured by any mortgage, now amounts in the aggregate to the sum of $13,300,000, besides interest; and whereas said bonded debt, as it now exists, is represented and made up as follows, viz.:" Then followed a statement of the various classes of mortgage bonds, above mentioned, amounting in all to $11,700,000; the equipment bonds, $600,000; and bonds issued by the consolidated company, due April 1, 1871, $1,000,000; and the last two classes described as not secured by any mortgage.

"And whereas it has been deemed for the interest of the said party of the first part, as well as for the benefit of the holders of all said various classes of bonds, that the whole of the same should be consolidated into one and the same mortgage debt, upon equitable principles; and whereas the increasing freight business of the road of the party of the first part requires additional equipments to do the same; and whereas it has been deemed expedient for the preservation of the bridges on the line of said road that the same should be covered, and that additional depot accommodations should be obtained, and that the road through its entire length should be fenced; and whereas the expenses to be incurred for the above should be provided for by the creation of new capital; and whereas for the purposes aforesaid, and for the objects herein

stated, the said company, party of the first part, has resolved to make and issue its bonds to the extent of $15,000,000, and to secure the payment of the same by a mortgage upon its entire property; and that of the amount of said bonds to be made and issued thereon should be retained $13,300,000 to retire, in such manner and upon such terms as the directors of said company may from time to time prescribe, a like amount of the bonds of the various companies hereinabove enumerated and described and representing the aforesaid bonded debt, and that the balance of said bonds, to wit, $1,700,000 thereof, should be used to provide the said additional equipment and other improvements hereinabove mentioned, and for such additional purposes as the said directors may deem advisable."

Bonds to the amount of $2,700,000 only were issued under that mortgage; $1,700,000 for money borrowed, and $1,000,000 to retire the bonds of the consolidated company that became due April 1, 1871.

The consolidated company paid the interest on the equipment bonds until November 1, 1874, after which no payment was made of interest thereon.

On April 1, 1873, the consolidated company executed to the trustees under the mortgage of February 1, 1867, and in order " to give assurance to all persons whom it may in any wise concern, that the said reserved bonds shall not, nor shall any or either of them, be used for any other purpose than the retiring of the said funded debt in some part thereof," a supplemental agreement, by which it covenanted with the trustees, and with all such parties, that it would not " make or issue, or attempt to make or issue, any of the remaining $12,300,000 aforesaid bonds secured by the said indenture of mortgage, except for the purpose of, and subsequent to or simultaneously with, the retiring of an equal amount of the balance remaining of the said funded debt."

On February 1, 1873, two months before the execution of the agreement of further assurance, the consolidated company made another mortgage to secure other bonds to be issued by the company to the amount of $5,000,000, payable in gold. Default having been made in the payment of interest on bonds

so issued, proceedings for the foreclosure of that mortgage
were instituted and a receiver appointed on February 22, 1875,
and a decree was afterwards entered for the sale of the· rail-
road, franchises and other property of the company, subject to
the liens of all earlier mortgages, and without prejudice to
any claim that might be made by the holders of the equip-
ment bonds.   Under that decree .the property was sold and
conveyed to the purchasers, who afterwards became the Wa-
bash, St. Louis and Pacific Railway Company, the appellant
in this case.

None of the equipment bonds were ever exchanged for
bonds under the mortgage of 1867, nor did any holders of
equipment bonds demand an exchange until after May 1, 1875.

The statute of Ohio of April 10, 1856, in force at the time
of the issue of the·equipment bonds and of the consolidation in
question, by § 1, made it lawful for any railroad company in
Ohio to consolidate its capital stock with the capital stock of
any railroad in an adjoining State, whenever their roads united
so as to form a continuous line ; by § 2, provided that the con-
solidation should ·be made by agreement of the directors of
each company, "prescribing the terms and conditions thereof,"
and that such agreement, when ratified by the stockholders,
should "be deemed and taken to be the agreement and act of
consolidation of said companies;" and also contained the fol-
lowing provisions :

"SECT. 3. Upon the making and perfecting the agreement
and act, as provided in the preceding section, and filing the
same, or a copy, with the Secretary of State, the several cor-
porations, parties thereto, shall be deemed and taken to be one
corporation, possessing within this State all the rights, privi-
leges and franchises, and subject to all the restrictions, dis-
abilities and duties of such corporation of this State so con-
solidated."

"SECT. 5. Upon the election of the first board of directors of
the corporation created by said agreement of consolidation and
by the provisions of this act, all and singular the rights, privi-
leges and franchises of each of said corporations, parties to the
same, and all the property, real, personal and mixed, and debts

due on account of subscriptions of stock or other things in action, shall be deemed to be transferred and vested in such new corporation without further act or deed; and all property, all rights of way, and all other interests, shall be as effectually the property of the new corporation as they were of the former corporations, parties to said agreement; and the title to real estate, either by deed, gift, grant, or by appropriations under the laws of this State, shall not be deemed to revert or be impaired by reason of this act: Provided, that all rights of creditors, and all liens upon the property of either of said corporations, shall be preserved unimpaired, and the respective corporations may be deemed to be in existence to preserve the same; and all debts, liabilities and duties of either of said companies shall henceforth attach to said new corporation and be enforced against it to the same extent as if said debts, liabilities and duties had been contracted by it."

"SECT. 7. Suits may be brought and maintained against such new company in the courts of this State for all causes of action in the same manner as against other railroad companies in this State." 1 Swan & Critchfield's Statutes, 327, 328.

The statute of Indiana in force at the same time, upon the subject of consolidation, was as follows:

"Any railroad company heretofore organized under the general or special laws of this State, shall have the power to intersect, join and unite their railroad with any other railroad constructed or in progress of construction in this State, or in any adjoining State, at such point on the State line, or at any other point, as may be mutually agreed upon by said companies; and such railroad companies are authorized to merge and consolidate the stock of the respective companies, making one joint stock company of the two railroads thus connected, upon such terms as may be by them mutually agreed upon, in accordance with the laws of the adjoining State with whose road or roads connections are thus formed: Provided, their charters authorize said railroads to go to the State line, or to such point of intersection." Stat. February 23, 1853, § 1; 1 Gavin & Hord's Statutes, 526.

The only provision of the statutes of Illinois, cited in argu-

ment, was the provision that "such consolidation may take place whenever the said companies shall respectively agree upon the terms and conditions of the same." Stat. February 28, 1854, ch. 9, § 2; 1 Gross's Statutes, 537.

*Mr. Wager Swayne, Mr. Abram Hendricks,* and *Mr. H. S. Greene* for appellants.

*Mr. Charles W. Hassler* for appellees.

*Mr. R. P. Ranney, Mr. E. C. Sprague, Mr. George F. Comstock* and *Mr. John G. Milburn,* counsel for parties in like interest with the appellees in a suit pending in the Supreme Court of the State of Ohio, also, by permission of the court, and with the consent of appellants' counsel, filed a brief in support of the lien of the equipment bonds.

Mr. Justice Gray, after making the foregoing statement of facts, delivered the opinion of the court.

The claim of the holders of the equipment bonds to a lien on the property of the Toledo, Wabash and Western Railway Company was asserted upon several grounds.

1. It was contended that the property of the Toledo and Wabash Railway Company was a trust fund for all its creditors, and that upon the consolidation the Toledo, Wabash and Western Railway Company took the property of the Toledo and Wabash Railway Company charged with the payment of all its debts.

The property of a corporation is doubtless a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true, in the case of a corporation, as in that of a natural person, that any conveyance of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them. Story Eq. Jur. § 1252; *Curran* v. *Arkansas,* 15 How. 304;

*Graham* v. *Railroad Co.*, 102 U. S. 148, 161; *Railroad Co.* v. *Howard*, 7 Wall. 392; *Goodin* v. *Cincinnati & Whitewater Canal*, 18 Ohio St. 169.

But. upon the consolidation, under express authority of statute, of two or more solvent corporations, the business of the old corporations is not wound up, nor their property sequestrated or distributed, but the very object of the consolidation, and of the statutes which permit it, is to continue the business of the old corporations. Whether the old corporations are dissolved into the new corporation, or are continued in existence under a new name and with new powers, and whether, in either case, the consolidated company takes the property of each of the old corporations charged with a lien for the payment of the debts of that corporation, depend upon the terms. of the agreement of consolidation, and of the statutes under whose authority that consolidation is effected.

In the present case, before the consolidation, no lien of any kind existed in favor of the equipment bonds; and the consolidation was made under and pursuant to statutes of Ohio, Indiana and Illinois, passed before the issue of those bonds, and to which the contract of the bondholders was therefore subject.

The effect of the Ohio Consolidation Act was to merge the old corporations into the new one, which took their place, succeeded to their property and assumed their liabilities. *Shields* v. *Ohio*, 95 U. S. 319; *Railway Co.* v. *Georgia*, 98 U.S. 359. The liability imposed by that statute upon the new corporation for the debts of the old ones is the same as theirs, neither greater nor less. The provision of § 5 that "all rights of creditors, and all liens upon the property of either of said corporations, shall be preserved unimpaired," clearly distinguishes debts secured by lien from debts not so secured, and indicates no intention to create a new lien in favor of creditors who before had none, but simply preserves to each class of creditors the rights belonging to it before the consolidation. The further provisions of this section, that "the respective corporations may be deemed to be in existence to preserve the same," and that all debts of either of the old companies shall henceforth attach

to the new corporation and be enforced against it to the same extent as if it had contracted them, lead to the same conclusion.

The statute of Indiana is less specific in its provisions, but expressly authorizes railroad companies within the State to consolidate with railroad companies in an adjoining State "in accordance with the laws of the adjoining State," and, as is well settled by decisions of the Supreme Court of Indiana, does not give to unsecured creditors of the old companies any lien or precedence as against a subsequent mortgage of the consolidated property. *McMahan* v. *Morrison,* 16 Indiana, 172; *Indianapolis, Cincinnati & Lafayette Railroad* v. *Jones,* 29 Indiana, 465; *Paine* v. *Lake Erie & Louisville Railroad,* 31 Indiana, 283, 349; *Jeffersonville, Madison & Indianapolis Railroad* v. *Hendricks,* 41 Indiana, 48.

It was not suggested in argument that there was any material difference in the statutes of Illinois upon the subject.

This court therefore concurs in opinion with the Circuit Court that the mere fact of consolidation, under these statutes, did not create any lien in favor of the equipment bonds.

2. It was next contended that the stipulation in the agreement of consolidation that the bonds and debts therein specified of the former companies shall "be protected by the said consolidated company" created a lien in their favor.

But it is only "as to the principal and interest as they shall respectively fall due," and "according to the true meaning and effect" of the instruments or bonds which are the evidence of the debts, that it is stipulated that the debts shall "be protected by the said consolidated company;" and the stipulation covers debts secured by mortgage as well as unsecured debts. The agreement "to protect" referring to the time of payment, and "the true meaning and effect" of the equipment bonds having been to create only a personal and unsecured debt of one of the former companies, the words "shall be protected" must have the same meaning which they ordinarily have in promises of men of business "to protect" drafts or other debts, not made or contracted by themselves, that is to say, a personal obligation to see that they are paid at maturity.

3. It was further contended that by the transfer of the prop-

erty of the Toledo and Wabash Railway Company to the consolidated corporation, and the enumeration of the equipment bonds in the basis on which the former company entered into the consolidation, those bonds were part of the consideration of the transfer, and that the case comes within the principle of a vendor's lien for unpaid purchase money.

But we are unable to perceive any analogy between the two cases. The doctrine of vendor's lien applies only to sales of real estate. The consolidation of the stock and property of several corporations into one was not a sale; and it did not affect real estate only, but included franchises and personal property. *Green County* v. *Conness*, 109 U. S. 104.

4. The remaining question is whether the holders of the equipment bonds have acquired any lien under the provisions of the mortgage executed in 1867 by the consolidated company of all its franchises and property, to secure the payment of new bonds to be issued by that company.

It is true that the object of that mortgage, as appears by its recitals, was that the whole of the debts of the consolidated company, including the debts of either of the companies out of which it had been formed, whether secured by mortgage, or, as in the case of the equipment bonds, not secured at all, "should be consolidated into one and the same mortgage debt, upon equitable principles." The mortgage accordingly provided that $13,300,000 of the new bonds should be retained, in order " to retire, in such manner and upon such terms as the directors of said company may from time to time prescribe," a like amount of the earlier bonds.

But that mortgage secured only bonds issued under it, and those bonds were all to be payable in forty years from its date. The directors were authorized to exchange such bonds for existing bonds, and it is possible that any holders of existing bonds might have compelled such an exchange by seasonably applying for it. But the company could not compel any bondholder to accept, as a substitute for the bonds which he held, new bonds payable at a later period. The equipment bonds were payable according to their terms in 1883, and the bonds issued under the new mortgage would not be payable until

1907. The holders of the equipment bonds might prefer to hold without security their bonds payable in sixteen years, rather than to take instead bonds secured by mortgage, payable twenty-four years later. They took no steps to obtain such an exchange for more than eight years after the execution of the mortgage of 1867, nor until after the institution of proceedings to foreclose the subsequent mortgage, executed by the company in 1873, to secure the payment of a new issue of bonds. The lien created by the latter mortgage took precedence of any claims which were not already secured by any prior mortgage. When the whole property of the consolidated company was sold under the decree of foreclosure of the mortgage of 1873, subject only to prior mortgages and liens, the purchasers took the property free from all debts not so secured.

The necessary conclusion is, that the property sold under the decree of foreclosure is not subject to any lien in favor of the holders of the equipment bonds.

*Decree reversed.*